Filed 3/28/24  In re M.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re M.S. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E081139 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2100767) |
| v. | OPINION |
| T.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

Jack A. Love, under appointment by the Court of Appeal, for minors.

1

T.S. (father) appeals from orders entered by the juvenile court terminating its jurisdiction over minors M.S. and T.S. (the children), granting father and A.S. (mother) joint legal custody, but granting sole physical custody to mother. Father argues the juvenile court abused its discretion by granting mother sole physical custody. We affirm.

I.

FACTS AND PROCEDURAL BACKGROUND

This juvenile court case stems from a contentious marital dissolution proceeding. In February 2020, the family court issued a temporary restraining order (TRO) protecting father and the children from mother. The court temporarily ordered that father have custody of the children and that mother have no contact with them. The family court found mother's allegations against father, in her own request for a TRO, were not credible and that she had been untruthful during her testimony. In addition, the court indicated it was concerned mother had been coaching the children. In September 2020, the family court awarded father sole legal and physical custody of the children and ordered that mother have supervised visits. Mother was granted unsupervised visits the following August. Finally, in October 2021, the parents agreed to share legal and physical custody of the children.

In November 2021, DPSS received a referral that mother had threatened father with a knife and encouraged the children to vandalize father's property. When interviewed, M.S. said she was afraid of father because he was "mean." She also said father starved the children, that he had called the police on them, and that they had a

2

recent physical altercation when father had assaulted her sister. She did not want to live with father. T.S. also stated father would hit the children, not feed them, and call the police about them. With regards to the recent physical incident, T.S. said father had attacked her because he wanted to see the child's phone, that M.S. had grabbed a knife to protect T.S., and father then attacked M.S. She too did not want to live with father. Both children denied that mother had involved them in the custody dispute.

Mother reported her marriage to father had ended because father had been physically and emotionally abusive toward her. She said father would pretend to be the victim when law enforcement was called. Mother blamed father for the family's problems.

Father reported he had M.S. and T.S. every Tuesday and Thursday. He denied any abuse or neglect. He told the social worker the children preferred mother because she did not hold them accountable for their actions, the children and mother tried to make him look bad so he would lose custody of the children, they refused to attend school when in his care, and they repeatedly made false allegations of abuse and neglect. Father reported he had video cameras installed in the home to protect himself, but the children had broken them. He had also contacted law enforcement for help getting the children to school, but the police refused to intervene. The most recent incident occurred when M.S. again refused to attend school. She then assaulted father and the children grabbed knives as weapons. Father denied putting his hand on either child as he "[knew] better than to touch them." He said that he had previously obtained a restraining order against mother

3

because she had tried to take the children away from him. Her request for a TRO against him—based on false allegations of sexual abuse—had been denied.

During DPSS's investigation, father obtained a TRO against Mother and temporary full custody of the children, because mother had been stalking him and coming to his home. Thereafter, the children had better attitudes and were treating father well. However, M.S. still refused to attend school and spoke to mother on a phone mother had given her, which M.S. hid from father. Father tried to get the children into therapy. The children continued to complain to the social worker about father and the care they received in his home. The children's attitudes and behaviors again became problematic when the family court dismissed the current restraining order against mother. Father wanted DPSS's assistance with addressing the children's behaviors and their relationship with mother.

On December 15, 2021, DPSS filed a petition in the juvenile court alleging the children were dependents pursuant to Welfare and Institutions Code[1] section 300, subdivision (b)(1). DPSS alleged there were concerns the parents were neglecting the children's health, safety, and well-being by involving them in the parents' custody battle, mother had been manipulating and coaching the children, father had failed to address the children's mental health needs, the children had disclosed physical abuse in father's home, neither child wished to reside with father, and DPSS had previously investigated

_____

[1] All undesignated statutory references are to the Welfare and Institutions Code.

4

and worked with both parents regarding earlier abuse and neglect allegations. The children were not detained.

At the initial hearing conducted December 30, 2021, the juvenile court found a prima facie showing had been made the children were dependents pursuant to section 300, and released them to both parents. The court ordered the children to attend therapy and the parents to not discuss the case with them.

Before the jurisdiction hearing, both children told the social worker they disliked father and did not want to visit him. Later, M.S. refused to attend school even while residing with mother. The children then began to refuse visits with father, and even refused to speak with him. M.S. and T.S. both exhibited significant mental health issues.

Father and mother both denied the allegations against themselves and blamed the other parent for the children's issues. Regarding the allegation that father had failed to address the children's mental health, father told the social worker he had paid for therapy but the therapist was aligned with mother's attorney and father wanted the children to have a different therapist. Father was engaged in counseling and his therapist was concerned about the possibility mother was coaching the children.

The children's therapist also spoke with the social worker. She disputed father's statements and informed the social worker it was difficult to schedule appointments with father and that mother had paid for most sessions. The therapist reported the children clearly preferred to live with mother. During one hourlong session, father spent the entire

session trying to convince the therapist "to hate the mother" and to conclude the children should have no contact with mother.

In May 2022, M.S. alleged father had touched her on her private parts when she was between the ages six through 11. T.S. reported that father watched the children in the shower and made them watch pornographic videos.

At a combined jurisdiction and disposition hearing held on October 12, 2022, father submitted on DPSS's jurisdictional and dispositional recommendations. The juvenile court sustained an amended petition that deleted the allegations against mother. The court declared the children to be dependents, maintained them with both parents, ordered mother and father to receive family maintenance services, and further ordered that the parents only communicate through the talking parents program. Both parents' services consisted of a parenting class and counseling.

In a report for the section 364 family maintenance status review hearing, the social worker reported the children were doing well in mother's custody and there were no concerns for their health or safety. Since being placed with mother, both children had excelled in school and participated in extracurricular sports, and both had completed wraparound services and met their treatment goals. The social worker indicated a clinician would provide an outside referral for additional therapy for T.S. once the case was closed. Both children told the social worker they wanted to live with mother. In addition, the social worker stated that during the reporting period the children refused to visit with father.

The social worker also reported father had completed his case plan, and the social worker opined father had benefitted from the services. Father had successfully completed 24 sessions of general counseling and had met his treatment goals. He told the social worker he enjoyed therapy, felt that he had benefitted from it, and had even asked for extra sessions. Father had also completed a parenting course and, although the courses were directed more to parents with younger children, father told the social worker he had learned co-parenting skills and ways to effectively communicate with children. He missed the children, hoped to establish a relationship with them, and consistently asked the social worker about them. The social worker reported father was polite and respectful with her.

Mother also successfully completed a parenting course and reported having benefited from it. She was in therapy, doing well, and the therapist had no concerns about her. Mother told the social worker that, if the children wished to visit father in the future, she would support that decision and pose no barriers to such visits.

DPSS initially recommended mother be given sole legal and physical custody of the children. However, at the review hearing counsel for DPSS informed the juvenile court the recommendation for sole custody was improper because the children had never been removed from father. The new recommendations were for joint legal and joint physical custody, with primary physical custody to mother. Father's counsel agreed with the changed recommendations and that the children should not be forced to visit with father.

7

During the continued review hearing, counsel for DPSS again stated the recommendation was for joint legal and joint physical custody, with primary physical custody to mother, and submitted the matter without further argument. Counsel for the children asked the juvenile court to follow DPSS's initial recommendation and grant mother sole legal and physical custody. Counsel indicated that, for the entire duration of the case, the children had declined to visit with father and that it would be in the best interests of the children to grant mother sole physical custody. Mother's counsel joined in this argument. Father's counsel argued the juvenile court should order joint legal and joint physical custody, with primary custody to mother. Counsel stated the children should not be forced to visit with father, but argued father should nonetheless be given joint physical custody.

The juvenile court judge noted this proceeding was the result of "the conflict that's going on with [the] parents" in the family law case and that, "as everyone knows, I was also the family law judge . . . so I do know this case well." Although the juvenile court proceeding had also been "very contentious," the court noted the fact both parents had successfully completed and benefited from their services was "an incredibly positive development." The court said joint legal custody was appropriate and father should not be entirely removed from the decision-making process with respect to the children, but it indicated a factor that weighed heavily in favor of giving mother sole physical custody was how well the children had been doing in school and with extracurricular activities since being placed with mother. Therefore, the court terminated dependency jurisdiction

8

and indicated that it would sign custody orders granting joint legal custody to the parents and sole physical custody to mother.  Finally, the court ordered a minimum of one visit for father each week but indicated the children would not be forced to participate.

Father timely appealed.[2]

## II.

## DISCUSSION

A.    *Applicable Law and Standard of Review*.

When, as here, the children are placed under the supervision of the social services agency but not removed from their parents, the juvenile court must terminate its jurisdiction over the children if it concludes the conditions no longer exist to justify the initial assumption of jurisdiction under section 300.  (§ 364, subd. (c).)  Section 362.4, subdivision (a), "authorizes the juvenile court, when terminating jurisdiction over a dependent child, to issue a custody and visitation order that will become part of the parents' family law file."  (*In re Anna T*. (2020) 55 Cal.App.5th 870, 871, fn. omitted; see *In re Chantal S*. (1996) 13 Cal.4th 196, 203.)  The court's custody and visitation order under section 362.4, commonly referred to as an "'exit order'" (*In re T.S*. (2020) 52 Cal.App.5th 503, 513), "may not be modified by the family court 'unless the court finds that there has been a significant change of circumstances since the juvenile court issued

_____

[2]  Mother did not appeal and is not a party to this proceeding.

Because DPSS had requested the juvenile court grant father joint physical custody, DPSS declined to file a respondent's brief in this appeal and instead requested we appoint counsel for the children.  We granted the request, and appellate counsel for the children filed a brief supporting the juvenile court's order.

the order and modification of the order is in the best interests of the child.'" (*Anna T.*, at pp. 871-872; see § 302, subd. (d).)

"When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.'" (*In re T.S.*, *supra*, 52 Cal.App.5th at p. 513; see *In re J.M.* (2023) 89 Cal.App.5th 95, 112 ["The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests."].) The best interest of the child standard, applicable at all stages of dependency proceedings, "'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.'" (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Factors the juvenile court should consider include a parent's history, current efforts and fitness, and a child's success in their current placement. (Cf. *Ethan N.*, at pp. 66-68; *In re A.G.* (2012) 207 Cal.App.4th 276, 281.)

"'[T]he juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child,'" and it "'has broad discretion to make custody [and visitation] orders when it terminates jurisdiction in a dependency case.'" (*In re J.M.*, *supra*, 89 Cal.App.5th at p. 112; see *In re N.M.* (2023) 88 Cal.App.5th 1090, 1094.)

10

"We review the juvenile court's exit orders for an abuse of that discretion." (*In re J.M.*, *supra*, 89 Cal.App.5th at p. at p. 113; see *In re C.W.* (2019) 33 Cal.App.5th 835, 863.) "'When applying the deferential abuse of discretion standard, "the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'"" (*In re Maya L.* (2014) 232 Cal.App.4th 81, 102.) "[W]e '"must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child."'" (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186-187; see *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) "'""When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'"" (*In re N.M.*, *supra*, 88 Cal.App.5th at p. 1094.)

B.     *The Juvenile Court Did Not Abuse Its Discretion By Granting Mother Sole Physical Custody of the Children.*

Father argues the juvenile court abused its discretion by granting mother sole physical custody because the children were never removed from his custody, he successfully completed and benefited from his family maintenance services, DPSS recommended the court issue an exit order of joint physical custody, and mother's past actions during the family law proceeding demonstrate he should share physical custody. We are not persuaded.

As father contends, because the juvenile court had never removed the children from father's custody, DPSS opined that granting mother sole custody would be improper and instead recommended the juvenile court grant joint legal and physical custody. But a social services agency's recommendation regarding termination of jurisdiction, and, by necessary implication, its recommendations regarding custody and visitation, is not binding and the juvenile court must make its own determination. (See *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1155 ["[E]ven if the social worker or department recommends termination of dependency jurisdiction, the juvenile court is not bound by that recommendation and may retain jurisdiction 'if there is a preponderance of evidence that the conditions are such to justify that retention.'"]; *In re N.O* (2019) 31 Cal.App.5th 899, 923-924 [same].)

Moreover, even though the children were never removed from father, and he successfully completed and benefited from his family maintenance services, the juvenile court was not required to award joint physical custody. "[A] finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268; see, e.g., *In re John W.* (1996) 41 Cal.App.4th 961, 974 ["A child's best interests are not necessarily served by shuttling between two parents, particularly during the school year"].) "[T]hat the parent whose custody has been subject to supervision no longer requires supervision is relevant to, *but not necessarily determinative of*, the best interests of the child." (*Nicholas H.*, at

p. 268, italics added.)  Here, the record demonstrates, and the juvenile court found, that the children thrived, did well in school and extracurricular activities, and successfully completed wraparound services since they had been placed in mother's sole care.  The juvenile court did not abuse its discretion by implicitly concluding the children's progress would be jeopardized if they were placed jointly with father.

Father also places much emphasis on the fact the family court had previously found mother lacked credibility and expressed concern that mother had been manipulating the children.  In light of that history, father argues mother still cannot be trusted to support the children if they wish to visit father, with the result "that the children would become further alienated from Father."  But, the juvenile court judge (who, coincidentally, presided over the family law case), expressly stated he was very familiar with the family law proceeding and with how contentious it had been.  That judge was in the best position to determine whether mother had benefited from her counseling and services and conclude that, under *current* circumstances, mother is a fit parent, she will cooperate and facilitate visits with father if the children so desire, and it is in the children's best interest to be placed solely with her.  We cannot second guess the juvenile court's implicit credibility findings.  (*In re Maya L.*, *supra*, 232 Cal.App.4th at p. 104, fn. 6 ["As a reviewing court, we have no power to revisit the credibility of witness or reweigh the evidence."].)

Finally, we find it significant that throughout this case the children said they wanted to live with mother and refused to visit with or have much if any contact with

father. Father argues the juvenile court erred by allowing the children to dictate in whose physical custody they would be placed. As father contends, "there is no law providing for children to determine their own custody orders." However, while not determinative, a child's expressed desire to be placed solely with one parent is powerful demonstrative evidence that it would be in the child's best interest to do so. (*In re J.M.*, *supra*, 89 Cal.App.5th at p. 115 [no abuse of discretion to issue exit order of sole physical custody to mother when, inter alia, the child "stated she was not comfortable visiting or living with father at all."]; cf. *In re Aljamie D*. (2000) 84 Cal.App.4th 424, 432 [Although a child's wishes are not determinative of their best interest, child's testimony she wanted to live with her mother, in support of mother's request for modification of order placing the child in foster care, "constitutes powerful demonstrative evidence that it would be in her best interest to allow her to do so."].)

## III.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

14